**GREAT WESTERN STEEL, INC.**

v.

**The UNITED STATES.**

No. 574–83C.

United States Claims Court.

Oct. 3, 1983.

John S. Pachter, Vienna, Va., for plaintiff; Arthur I. Leaderman, of Wickwire, Gavin & Gibbs, Vienna, Va., of counsel.

Sara V. Greenberg, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

COLAIANNI, Judge:

On September 15, 1983, plaintiff, Great Western Steel, Inc. (Great Western), filed an action in this court seeking to enjoin the Bonneville Power Administration (BPA) from awarding a contract to a competing bidder on the solicitation now at issue. The BPA stated that it would withhold award of a contract on the disputed portion of the solicitation only through September 30, 1983.[1]

This case is before the court on cross-motions for summary judgment pursuant to RUSCC 56. The parties are in agreement on all facts necessary for the resolution of this case. Upon review of the motions presented and supporting documents, and following oral argument of counsel, this court concludes that the BPA's modified invitation for bids (IFB) for this procurement manifested its intention to equate compliance with the Buy American Act and the bidder's offer to perform as a labor surplus area concern (LSAC). This court finds that BPA did not breach its implied-in-fact contract with plaintiff to fully and fairly consider plaintiff's bid under the terms of the solicitation. Therefore, plaintiff's motions for summary judgment and injunctive relief are denied and defendant's cross-motion for summary judgment is granted.

### Facts

The Bonneville Power Administration issued an invitation for bids for the fabrication and delivery of four schedules of steel power transmission towers. Each schedule

---

1. This opinion amplifies the court's September 29, 1983, order and telephonic conference with counsel of record. During the conference, counsel were told that defendant's motion for summary judgment was granted and plaintiff's motions for injunctive relief and summary judgment were denied.

was for two or more tower types, and the erection of any one tower type did not depend on any other. Another contractor was to assemble the delivered steel and erect the towers. The total of all four schedules equaled 15,300 tons of steel.

As finally issued, the IFB contained requirements applicable to both LSACs and the Buy American Act (the Act). All bidders were required to submit a "Buy American Representation and Certification." In addition, the IFB required each bidder to agree to perform as an LSAC. If the bidder failed to comply with the LSAC requirement, its bid would be rejected as nonresponsive. Several passages in the IFB, as amended, are important in defining the terms of the solicitation and the intended evaluation method for the bids.

The IFB defined LSAC as follows:

(3) The term "labor surplus area concern" means a concern that together with its first-tier subcontractors will perform substantially in labor surplus areas.

(4) The term "perform substantially in labor surplus areas" means that the costs incurred on account of manufacturing, production, or appropriate services in labor surplus areas exceed 50 percent of the contract price.

In addition, the IFB notified all bidders that "Award will be made by *SCHEDULE OR COMBINATION OF SCHEDULES, OR AS A WHOLE, on the basis of the lowest evaluated cost to the Government.*" (Emphasis added.)

On April 22, 1983, BPA issued Amendment No. 001, which contained several highly pertinent passages. That amendment stated:

(a) The offeror certifies as part of his offer, that if awarded a contract, it will perform as a labor surplus area concern. For this solicitation, *performance as a labor surplus area concern necessarily re-*

2. Amendment No. 001 deleted the following paragraph from the IFB:

Lump sum bids of reduced or alternate amounts for various combinations of schedules will be accepted. *Each schedule, however, must fully comply with the Labor Surplus Area requirements to be considered in a*

*sults in a domestic end product.* The offeror's certification to perform as a labor surplus area concern therefore certifies that it will furnish a domestic end product.

(Emphasis added.)

Amendment No. 001 also deleted a section from the original IFB [2] and substituted the following language:

Bids for combined SCHEDULES will be considered for award. Each bid for combined SCHEDULES shall be submitted separately, on its own "SCHEDULE OF ITEMS" sheets for the appropriate SCHEDULES, complete, with all quantities, unit prices, and totals shown. The bidder shall use reproduced copies of pertinent sheets, stapled together and marked to identify the combination of SCHEDULES being bid, and attached to the rear of this packet.

If the facts of the bidder's BUY AMERICAN REPRESENTATION AND CERTIFICATION (ref. par. C–11) for a single schedule bid are changed in the bid for combined SCHEDULES, a separate certification shall be completed and attached to each bid in which there is a change in facts, using reproduced copies of the certification sheets.

Amendment No. 001 did not delete the section of the IFB concerning application of the Buy American Act differential to foreign offers. The amendment did, however, append a note to that section. As amended, the section stated, in pertinent part:

B–5. FOREIGN OFFERS

\* \* \* \* . \* \*

(b) For purposes of comparison for award, the following factors shall apply to foreign offers within the meaning of the Buy American Act (See paragraph F–1).

*lump sum bid for a combination of schedules.* A bid on a Schedule that has been determined nonresponsive in regards to the Labor Surplus Area provisions cannot be brought into compliance through a combined bid with other schedules.

(Emphasis added.)

(1) When comparing foreign offers with the low domestic offer under the Buy American Act, an evaluating differential of six percent will be added to the price of each foreign end item delivered at destination but excluding the price of any additional work to be performed at the site such as installation or testing; provided, that the differential will be doubled to twelve percent in the event that the low domestic Offeror qualifies as a small business or labor surplus area concern.

\* \* \* \* \* \*

NOTE

This solicitation is restricted to offers from labor surplus area concerns. Foreign offers will not be considered. A foreign company may qualify as a labor surplus area concern by agreeing to incur costs of manufacturing production and appropriate services in excess of 50 percent of the contract price in a labor surplus area. *Offers from concerns agreeing to perform as labor surplus area concerns will not have Buy American Act factors applied for purposes of bid evaluation.* Offers from concerns that do not agree to perform as labor surplus area concerns are nonresponsive and will be rejected.

(Emphasis added.)

In addition, Amendment No. 001 modified the Schedule of Items section of the IFB. This section required the bidder to list, for each of the four solicited schedules, each line item. Before amendment, the IFB only required a statement of the unit price and total cost for each line item. As amended, the IFB required a breakdown of each line item, by quantity, unit price, and total cost, into its foreign and domestic parts.

On May 4, 1983, the BPA issued Amendment No. 002, which provided in relevant part:

---

**3.** Riverside's bid was subsequently found nonresponsive to the IFB and disqualified. The responsiveness of that bid is not an issue in this case.

**4.** Anchor's bid prices were broken down, for each schedule, as follows:

For this solicitation, it has been determined that *an offer from a concern that will agree to perform as a labor suprlus [sic] area concern will be evaluated as a domestic bid, and no Buy American evaluation factor will be applied.* Offers from concerns that do not agree to perform as labor surplus area concerns will be considered nonresponsive.

(Emphasis added.)

Bids were submitted by three companies: Great Western; Anchor Metals, Inc. (Anchor); and Riverside Industries, Inc.[3] Bids were opened on June 9, 1983. Anchor submitted a combination bid containing the lowest bid for each of the four schedules. For schedules I and IV, Anchor stated that all costs would be domestic, and for schedule II, Anchor intended that more than fifty percent of the costs would be domestic. For schedule III, however, Anchor intended to rely solely on foreign material and manufacture. Great Western proposed to perform schedule III by incurring purely domestic costs.

Anchor's combined bid for all four schedules was lower than any other combination. In addition, well over fifty percent of Anchor's total contract price represented domestic costs.[4] An award to Anchor of all four schedules would have been in the amount of $13,254,637. An award of schedules I, II and IV to Anchor and schedule III to Great Western would have been for $13,416,133.39.

On June 30, 1983, Great Western protested to the contracting officer the impending award to Anchor, alleging that Anchor had failed to comply with the Buy American Act or the LSAC requirements of the IFB with respect to schedule III. The contracting officer denied plaintiff's protest on July 20, and on July 29 plaintiff appealed to the administrator of the BPA. The BPA Bid Protest Review Board found in favor of

| Schedule I | – | $2,057,652.87 (Domestic) |
| Schedule II | – | $ 726,275.73 (Foreign) |
| | | $4,063,427.22 (Domestic) |
| Schedule III | – | $3,409,838.10 (Foreign) |
| Schedule IV | – | $2,997,442.81 (Domestic) |

Great Western on August 22, 1983, and directed the contracting officer to award schedule III to Great Western and schedules I, II and IV to Anchor. On September 8, however, the board reversed its earlier decision and found that Anchor's bid on schedule III was responsive.

BPA had announced its intention to award a contract for all four schedules to Anchor. On September 15, pursuant to an agreement reached by the parties, BPA awarded schedules I, II and IV to Anchor. BPA agreed to withhold award on schedule III through September 30, however, in order to allow this court to rule on plaintiff's claim that Anchor's bid on schedule III was non-responsive to the IFB.

*Discussion*

Plaintiff has presented one issue for decision: whether the government breached its implied-in-fact contract to fully and fairly consider plaintiff's bid under this IFB.[5] Plaintiff argues that, under the terms of this IFB, the BPA was required to assess each bid according to criteria and defini-

tions uniformly used by all government agencies and contractors when determining compliance with the Buy American Act.[6] Plaintiff asserts that the BPA's decision to equate Buy American Act compliance with the bidder's promised performance of an awarded contract as an LSAC is despite the terms of the IFB.

Plaintiff does not contend that a decision by the BPA to construct an equation such as this would contravene the Act, executive order, or BPA regulations and guidelines. Plaintiff does argue, however, that since the evaluation method BPA asserts is applied without exception by all federal agencies, including BPA,[7] the overwhelming presumption should be that the same method was to be applied in this case as well. If BPA intended to impose novel criteria for establishing compliance, it would have to have done so unequivocally on the face of the IFB. Otherwise, the standard methods for assessing compliance would apply. Under those methods, the BPA would have added at least a six percent differential to

5. In its brief, plaintiff raised several other issues that it no longer presses before this court. Foremost, plaintiff implied that BPA's actions were illegal. In its brief, plaintiff stated, "BPA's procurement authority does not permit it to abandon these [traditional] rules [for assessing a bid's compliance with the Buy American Act] when it suits BPA's whim." And again, "a clear expression of *Congress* would be necessary to permit BPA to interpret the Act according to its secret dictionary." (Emphasis added.) Plaintiff also attacked the application of BPA's assessment of these bids under the Act. Plaintiff called BPA's assessment "irrational, discriminatory and arbitrary" and stated, "The use of improvised criteria * * * improperly discriminated against Great Western's bid."

It appears that plaintiff has abandoned these arguments, however, except insofar as they serve to buttress plaintiff's claim that BPA failed to put all bidders clearly on notice of its intended application of the Buy American Act. At the hearing, plaintiff's counsel stressed that the only question before this court is whether the IFB clearly notified all bidders of BPA's intention to equate a bidder's compliance with the Buy American Act with that bidder's promised performance as an LSAC of any awarded contract. Within that framework, plaintiff asks this court to determine whether the BPA

breached its implied-in-fact contract to fully and fairly consider plaintiff's bid under this IFB.

6. Defendant initially contended that BPA is not bound by the strictures of the Buy American Act. Both parties now agree that the Act and accompanying Executive Order 10582 were explicitly incorporated into this IFB, thus binding BPA for the purposes of this procurement. Both parties also agree that BPA is specifically exempt from the Federal Procurement Regulations (FPR) implementing the Act. *See* 41 C.F.R. §§ 1–6.1, 1–6.2, 1–18.6 (1982). Those regulations were "prescribed by the Administrator of General Services under the Federal Property and Administrative Services Act of 1949, as amended," 40 U.S.C. §§ 471 *et seq.* (1969). *See* 41 C.F.R. § 1–1.003 (1982). That Act specifically exempts the BPA from its provisions. *See* 40 U.S.C. § 474(20) (1976).

BPA has issued its own guidelines, however, for effecting compliance with the Act in its procurements. Those guidelines largely parallel the procurement practices mandated by the FPR and the Defense Acquisition Regulations.

7. At argument, counsel for defendant admitted that BPA had never before determined Buy American Act compliance by applying LSAC performance criteria, as it has done for this procurement.

Anchor's schedule III bid.[8] With the addition of that differential, plaintiff's schedule III bid would have been the lowest submitted.

Plaintiff rejects defendant's assertion that Amendment No. 001 clearly notified all bidders of BPA's intended evaluation method. Plaintiff asserts that BPA therefore breached its implied-in-fact contract to fully and fairly consider plaintiff's bid by failing to apply long-established Buy American Act evaluation criteria when assessing bids for this procurement. On that ground, plaintiff rests its claim.

■ Plaintiff thus has stated a claim clearly within the jurisdiction of this court under section 133(a)(3) of the Federal Courts Improvement Act of 1982, as codified at 28 U.S.C. § 1491(a)(3). That section grants this court injunctive authority over "any contract claim brought before the contract is awarded." At this point in the development of the Claims Court's jurisdiction, it is firmly established that one type of claim contemplated by this section is the pre-award bid protest based on the implied-in-fact contract between the United States and bidders in government procurements that all bids submitted in conformity with the requirements of the IFB will be fully and fairly considered. *See Yachts America, Inc. v. United States,* 3 Cl.Ct. 447 at 449 (1983); *American Hoist & Derrick, Inc. v. United States,* 3 Cl.Ct. 198 at 201 (Cl.Ct. 1983); *Cecile Industries, Inc. v. United States,* 2 Cl.Ct. 690, 692 (1983). These cases are only three in a growing line that note this court's authority under 28 U.S.C. § 1491(a)(3) to grant injunctive relief in the bidder protest suits previously sanctioned by the United States Court of Claims in *Keco Industries, Inc. v. United States,* 192 Ct.Cl. 773, 780, 428 F.2d 1233, 1237 (1970), and *Heyer Products Co. v. United States,* 135 Ct.Cl. 63, 69, 140 F.Supp. 409, 412–13 (1956).

■ A careful review of the invitation at issue, however, clearly establishes the BPA's intention to equate Buy American Act compliance with the bidder's performance as an LSAC of an awarded contract. Amendment No. 002 unequivocally stated that an offer from a firm that would agree *to perform as an LSAC* "will be evaluated as a domestic bid, and *no Buy American evaluation factor will be applied.*" (Emphasis added.) In addition, Amendment No. 001 explicitly provided that "[b]ids for combined SCHEDULES will be considered for awards." Finally, that amendment deleted the provision in the original IFB that "[e]ach schedule * * * must fully comply with the Labor Surplus Area requirements to be considered in a lump sum bid for a combination of schedules."

Were this court to agree with plaintiff that the IFB required a separate Buy American Act evaluation of individual line items for each schedule as "end products," plaintiff still could not prevail. The IFB referred, in several passages, to foreign and domestic end products. However, the Act, Executive Order, implementing regulations, and guidelines do not ban the procurement of foreign end products. They merely burden those products with a "differential," effecting a price increase for the purpose of determining the lowest responsive, responsible bidder.

In this case, plaintiff has asked the court to focus on the question of whether the BPA properly informed the bidders of its intention to interpret and apply the Act in a manner which differed from its past application, and not upon the legality of the BPA's changes. As has been previously demonstrated, the fact that the BPA intended to test compliance with the Act by the same standard it was using for its LSAC clause was clearly communicated. The BPA did this by stating that the differ-

---

**8.** Arguably, a twelve percent differential might have been added if Great Western, with the low domestic bid, were found to be a small business or LSAC for purposes of the Act and this procurement were treated as one for supplies rather than construction. *Cf.* 41 C.F.R. §§ 1–6.- 104–4(b) (differential applied for supply contract); 1–18.603–1 (only six percent differential applied for construction contracts). Even if only the six percent differential were added to Anchor's bid, however, plaintiff's bid still would have been the lowest for schedule III.

**516**

ential, which is the heart of the Act and is essential to any finding in plaintiff's favor in this instance would not be applied against the bid of a firm that would perform as an LSAC. Anchor's bid demonstrated that its costs "incurred * * * in Labor Surplus Areas [would] exceed 50% of the contract price," thus qualifying Anchor as an LSAC. Without the application of the differential to Anchor's bid on schedule III, Anchor had submitted the lowest bid under this IFB.

Plaintiff also points out that the IFB as modified no longer asked for identification of the source of materials by schedule, but required such identification to be made on a line-item by line-item basis. Plaintiff argues that this indicated BPA's intention to apply traditional Buy American Act evaluation criteria. Plaintiff apparently failed to recognize that the change was not made to enable the BPA to carry out the Act in its usual manner, but rather, for certification and identification purposes.

■ Finally even if this court agrees with plaintiff that the IFB continued to apply the Act in its traditional manner, plaintiff still cannot prevail. This reading of the IFB ignores the above-quoted passages which clearly indicate BPA's intention to equate Buy American Act compliance with performance as an LSAC. If correct, plaintiff's interpretation raises a patent ambiguity in the IFB which would have required inquiry before the bids were opened. *Cf. Anthony Grace & Sons, Inc. v. United States,* 193 Ct.Cl. 248, 253–55, 433 F.2d 766, 768–69 (1970). Certainly, a reasonably prudent businessman would question any interpretation of the IFB that applies the Buy American Act on a line-item basis while denying use of evaluation factors if more than fifty percent of the contract price is incurred in a labor surplus area. This interpretation makes nonsense of the IFB, presenting a patent ambiguity.

The IFB, in part A–14, provided a procedure by which any bidder could raise objection to just such an ambiguity. That part required any aggrieved bidder to protest "within 10 working days of the date on which they had actual or constructive notice of the alleged adverse procurement action." Plaintiff waived any right to attack this IFB on the grounds of ambiguity when it failed to request a ruling from the contracting officer on its interpretation of the IFB. *See id.*

As noted above, plaintiff does not question the legality of BPA's equation, but only whether notice to all bidders had been made. The court finds that plaintiff had full and timely notice of BPA's intention not to apply the evaluation factors against the bids of LSACs.

CONCLUSION

In light of these provisions of the IFB, as amended, stating the BPA's intention to equate Buy American Act compliance with the bidder's performance as an LSAC of any awarded contract, it cannot be found that the BPA breached its implied-in-fact contract with the plaintiff to fully and fairly consider plaintiff's bid under the terms of the solicitation. Accordingly, defendant's cross-motion for summary judgment is granted. Plaintiff's motions for summary judgment and injunctive relief are denied, with plaintiff's complaint to be dismissed.