**34**

EASTERN MARINE, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

Bollinger Machine Shop and Shipyard, Inc., Defendant-Intervenor.

No. 105–84C

United States Claims Court.

April 5, 1984.

Joseph A. Artabane, Washington, D.C., for plaintiff; William E. Erickson, Washington, D.C., of counsel.

Michael T. Paul, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant. David Brochstein, United States Coast Guard, Washington, D.C., of counsel.

Marcus B. Slater, Jr., Washington, D.C., for defendant-intervenor.

## OPINION

MARGOLIS, Judge.

This pre-award contract case was brought by plaintiff Eastern Marine, Inc. (EMI), a Florida corporation, after its proposal for the construction of patrol boats was excluded from further consideration by the defendant United States through the United States Coast Guard (Coast Guard). The procurement involves some 40–50 million dollars with an additional future procurement in the same amount. Plaintiff seeks injunctive relief and a declaratory judgment that the defendant's actions were improper, or, in the alternative, an award of bid preparation costs. Plaintiff alleges 1) the Coast Guard treated it disparately by allowing the two remaining competitors to make changes in their proposals similar to those for which plaintiff's proposal was eliminated; 2) the defendant should be estopped from eliminating plaintiff's proposal from the competition; 3) the Circular of Requirements was ambiguous; and 4) the defendant failed to follow the appropriate evaluation procedures. Plaintiff contends, therefore, that the Coast Guard's actions were without a rational basis, and were arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

Plaintiff filed its complaint on March 1, 1984. At a hearing that day, the defendant stipulated that it would not award the contract before April 2, 1984. An expedited briefing schedule was ordered, and defendant submitted a motion for summary judgment on March 12, 1984. Meanwhile, Bollinger Machine Shop and Shipyard, Inc., one of the two remaining competitors, moved to intervene; its motion was granted on March 21, 1984. On March 23, 1984, the Comptroller General denied plaintiff's bid protest, *Eastern Marine, Inc.*, B–213945. After plaintiff submitted its response to defendant's motion for summary judgment, a consolidated hearing and trial pursuant to RUSCC 65(a)(2) was held from March 26–28, 1984. After trial, the defendant stipulated it would not award the contract until April 6, 1984. For the reasons set forth below, this Court finds for the defendant.

## FACTS

Plaintiff's proposal was submitted pursuant to Request for Proposals solicitation No. DTCG23–83–R–30024 (RFP), a competitive negotiation entitled Seven Patrol Boats with Options for More. The procurement involves the construction of small high speed patrol boats for use in the nation's effort to combat the importation of illegal drugs. Because of the Coast Guard's stated desire to produce a reliable boat in a short period of time, the procurement stressed from the outset the "Parent Craft" concept. Basically, offerors were to use a proven and reliable patrol craft (*i.e.*, the Parent Craft) as their prototype. As stated in the United States Coast Guard Patrol Boat (WPB) Circular of Requirements (COR), included in the RFP, "the

WPB [1] shall be based on an existing patrol craft modified to suit Coast Guard mission requirements." The COR set forth the requirements that an existing patrol craft had to meet to be accepted as a Parent Craft. For example, the Parent Craft had to have been operated in patrol service for a minimum of three years with at least ninety days a year at sea. The COR also set forth criteria limiting the deviations allowed between the Parent Craft and an offeror's WPB. Of particular importance to the case *sub judice*, COR section 042b stated in pertinent part:

> The Parent Craft shall possess the same hull form and dimensions (defined as underwater body and hull up to the sheer line), principal hull structure, underwater appendages, and propulsion configuration as the WPB.

The Coast Guard announced the WPB procurement in notices published in the August 1982 and March 1983 *Commerce Business Daily*. The notices indicated the Coast Guard was conducting a market survey to seek sources for the proposed procurement. The Parent Craft concept was both introduced and stressed. Equitable Shipyards, Inc. (Equitable), a Louisiana company represented by Mr. E. Knight Campbell, was one of several firms which responded to the March 1983 notice. Equitable proposed using the Turkish SAR–33 as its Parent Craft. Equitable, however, modified the SAR–33 by deleting one of its three engines, complete with shaft, strut and propeller.

During April 1983 the Coast Guard reviewed the responses to the March 1983 notice and determined that enough small shipyards were in competition to designate the procurement as a small business set aside, *i.e.*, only companies with less than 1,000 employees would be eligible. Equitable, a large shipyard, was therefore ineligible.

The Coast Guard issued the formal RFP on May 9, 1983. That same day, Captain Dean A. Frankenhauser, who was both the WPB Acquisition Team Chairman and the Source Evaluation Board (SEB) Chairman, called Campbell. The substance of this conversation and a number of other conversations between the two men was disputed. Basically, Frankenhauser claimed he called Campbell merely because he thought the Equitable response "looked like a very viable candidate." He testified that he had only three telephone conversations with Campbell, during which he never represented that a two engine WPB based on a three engine Parent Craft was acceptable. He also claimed to have continually referred Campbell to Lcdr. James Q. Neas, who was listed in the RFP as the person to contact for information concerning the procurement. Campbell, on the other hand, testified to having ten telephone conversations with Frankenhauser. Campbell also testified that Frankenhauser solicited him to find a small business to submit a proposal based on the SAR–33, and that Frankenhauser gave him a list of seventeen qualified shipyards to contact. Campbell further testified that on a number of occasions, Frankenhauser represented that the deletion of an engine, shaft, strut and propeller would be acceptable provided the offeror submitted data to verify performance claims.

Campbell contacted EMI and acted as its representative throughout the procurement. EMI submitted its proposal on July 11, 1983. EMI's proposal used the Turkish SAR–33 as the Parent Craft, modified by deleting one of its three engines and attendant shaft, strut, and propeller.

The Coast Guard followed the evaluation procedures set forth in the RFP. These procedures followed the more specific requirements of Department of Transportation Order DOT 4200.11, 41 C.F.R. § 12–99.000, as amended.[2] Under the first step,

---

1. WPB is the military designation for a Coast Guard patrol boat and will be used herein to designate the patrol boats being procured.

2. The cited regulation, 41 C.F.R. § 12–99.000, actually refers to DOT 4200.11 which has been superceded by DOT 4200.11A. Lcdr. Neas testified that he would have issued DOT 4200.11A to

proposals were preliminarily reviewed, and those proposals so grossly deficient as to be totally unacceptable on their face were eliminated. This very liberal standard was designed to eliminate only those proposals which, for example, did not represent a reasonable effort to address themselves to the essential requirements of the RFP or which clearly demonstrated that the offeror did not understand the requirements of the RFP. DOT Order 4200.11A, Ch. VII § 3. EMI's proposal was not eliminated in this first step. Coast Guard officers testified that at this early stage they believed a two shaft variant of the SAR–33 might exist.

The second step consisted of clarifying ambiguities found during the preliminary review. By letter dated July 28, 1983, the Coast Guard notified EMI of the ambiguities in its proposal. The letter did not mention the deletion of one of the Parent Craft's engines. DOT Order 4200.11A expressly provides that only ambiguities were to be identified at this stage, and no discussion of proposal weaknesses or deficiencies was to take place. The Order defines an ambiguity as "a descriptive statement(s) capable of being understood in two or more possible ways. . . ." A deficiency is defined as "a descriptive statement(s), or lack thereof, that fails to meet or does not allow the evaluators to determine if the minimum requirements of the RFP are met." Lcdr. James Q. Neas, Jr. testified that the deletion of an engine from the Parent Craft was a deficiency, not an ambiguity.

After making a detailed evaluation of the proposals, the Coast Guard would normally make a preliminary determination of the competitive range. Because of the unexpectedly large number of deficiencies in the proposals, however, the Coast Guard obtained a waiver to allow it to first release the offerors' deficiencies and weaknesses. In a letter dated August 31, 1983, the Coast Guard notified EMI of its deficiencies and weaknesses. Paragraph 10 of that letter stated:

anyone requesting DOT 4200.11. Plaintiff did

10. Parent Craft Drawing No. 63702510000 shows three propulsion shafts and WPB Drawing No. 6683–2510.00 shows two shafts. The proposal did not discuss the effects on performance and propulsion coefficient that result from this change.

Almost immediately, the Coast Guard realized paragraph 10 was ambiguous in that it contained two deficiencies which might be interpreted as one. Within two days, Neas called Campbell and explained the ambiguity in paragraph 10. Neas expressly told Campbell that the paragraph contained two deficiencies. Campbell replied that EMI would respond with this information in mind. EMI's written response, however, only discussed the effects of the deletion, not the deletion itself.

The proposals, complete with the offerors' responses to their deficiencies and weaknesses, were then submitted to the Source Evaluation Board (SEB). The SEB compiled a competitive range report assessing each offeror's strengths and weaknesses. The report was then forwarded to Dr. Robert Fairman, a DOT official empowered to make the determination of the competitive range. Dr. Fairman allowed all eight competitors to remain in the competition, but instructed the SEB to advise the eight of their remaining deficiencies and weaknesses. Any offeror which did not revise its proposal to meet the minimum requirements of the RFP would be eliminated from the final competitive range.

The SEB issued its final deficiency statements on November 8, 1983. The SEB notice to EMI again noted the deficiency pertaining to the deletion of the engine, shaft, strut and propeller. EMI proved unable to cure the deficiency and was eliminated from the competition on December 6, 1983.

EMI subsequently obtained information which led it to believe that the Coast Guard had allowed the two remaining competitors to deviate their WPB's from their respective Parent Crafts. At trial Commander John T. Tozzi, the Chairman of the SEB

not request either order.

Engineering Evaluation Team, testified that all offerors were allowed to make changes from their Parent Crafts. The changes made by the two remaining competitors did not substantially affect the hydrodynamics of their Parent Crafts and were not of the magnitude of EMI's.

## DISCUSSION

■ Plaintiff seeks injunctive relief alleging that defendant's actions were arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law. This Court's jurisdiction in a pre-award case is based on the government's implied contract to consider all bids fairly and honestly. *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1367 (Fed.Cir.1983). To prevail, plaintiff must show either that 1) there was no rational basis for the agency's decision in a matter committed primarily to its discretion, or 2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations. *Big Bud Tractors, Inc. v. United States*, 2 Cl.Ct. 188, 193 (1983) (Wood, J.), *aff'd mem.*, 712 F.2d 1118 (Fed.Cir.1983); *Kentron Hawaii Ltd. v. Warner*, 480 F.2d 1166 (D.C.Cir.1973). *See Harris Data Communications, Inc. v. United States*, 2 Cl.Ct. 229, 237 (1983) (Nettesheim, J.), *aff'd mem.*, 723 F.2d 69 (1983). "Judicial review of an agency pre-award procurement decision is, and should be, extremely limited in scope," and this Court must not substitute its judgment for that of the agency. *Baird Corporation v. United States*, 1 Cl.Ct. 662, 664 (1983) (Lydon, J.). Moreover, pre-award injunctive relief should be granted only in "extremely limited circumstances." *CACI, Inc.-Federal v. United States*, 719 F.2d 1567, 1581 (Fed.Cir.1983).

■ In the alternative, plaintiff seeks its bid preparation costs, a claim also based on the government's implied contract to consider bids fairly and honestly. *Heyer Products Co. v. United States*, 135 Ct.Cl. 63, 69, 140 F.Supp. 409, 412–13 (1956). The standard of proof where arbitrary and capricious action is charged is a high one.

*Keco Industries, Inc. v. United States*, 192 Ct.Cl. 773, 784, 428 F.2d 1233, 1240 (1970).

1. *Disparate Treatment.*

■ The plaintiff's main pretrial contention centered on its belief that the Coast Guard had allowed the two remaining offerors to make changes from their Parent Crafts which violated COR section 042b, while it eliminated plaintiff for making similar changes. At trial, however, plaintiff's evidence fell far short of showing disparate treatment which lacked a rational basis.

Plaintiff's contention stems mainly from undue reliance on its allegation that the deletion of the engine, shaft, strut and propeller would result in a WPB that performs as well as or better than the SAR–33. This allegation merely clouds the issue. The RFP and COR clearly stated that the Parent Craft concept was designed to enable the Coast Guard to obtain a proven and reliable WPB without the major operational testing usually associated with the procurement of new boats. In view of the purpose for procuring the WPBs and the need for them in as short a period of time as possible, the Parent Craft concept was plainly rational. The determination of whether a change from the Parent Craft violated COR section 042b was to be made by measuring the extent to which the change altered the WPB from the Parent Craft. A change from the Parent Craft violated COR section 042b if it cast doubt on the Coast Guard's ability to rely on the past performance of the Parent Craft. On the other hand, a small variation from the Parent Craft was acceptable if it did not cast doubt on whether the WPB would perform substantially the same as the Parent Craft. The extent to which a change altered a WPB from its Parent Craft was measured by the Coast Guard through calculations and by using its best judgment.

Viewed in this light, the Coast Guard had a rational basis for eliminating the plaintiff's proposal because of the deletion of the engine, shaft, strut and propeller. The deletion substantially changed the underwater appendages and the propulsion con-

figuration of the Parent Craft. This deletion was a direct violation of section 042b. Moreover, plaintiff's offer to perform model and full scale testing on its WPB did not alleviate the deficiency. Substantial testing of a new or altered boat was precisely what the Parent Craft concept was designed to obviate.

Commander John T. Tozzi testified that all of the offerors, including plaintiff, were allowed to make small variations under section 042b. He further testified that none of the allowed substitutions by the two remaining offerors substantially affected the hydrodynamic behavior of the Parent Craft. Given the purpose and rationale behind the Parent Craft concept, the Coast Guard had a rational basis for allowing these small changes while eliminating plaintiff's proposal for deleting an engine, shaft, strut and propeller.

### 2. *Estoppel*

██ Plaintiff contends that because of the representations of Captain Dean A. Frankenhauser, the defendant should be estopped from asserting that the deletion of the engine, shaft, strut and propeller violates the COR. The Court finds this aspect of the case most disturbing. It was Captain Frankenhauser who solicited Mr. Campbell to find a small business shipyard that could submit a proposal based on the SAR–33. It was Captain Frankenhauser who represented to Campbell that the deletion of the engine and its attendant equipment would not result in its elimination from the competition. Indeed, it is apparent to this Court that, but for the unauthorized solicitation and representations of Captain Frankenhauser, plaintiff never would have submitted a proposal.

Captain Frankenhauser admits only that he initially called Campbell and told him that in order for Equitable's design to enter the competition, it would have to be submitted by a small shipyard. Frankenhauser called no other representative of any other prospective offeror. He denied both knowing that the SAR–33 was a three engine craft and making any representa-

tions that the deletion of the engine, shaft, strut and propeller would be acceptable. He either denied or could not recall having some seven telephone conversations with Campbell, and his testimony on the substance of three admitted conversations was markedly different from Campbell's testimony. Campbell, a careful and methodical man, took notes of each of these conversations in his day book, a book he has maintained for four years and in which he notes the substance of all but the most mundane of his business calls. Moreover, on several of the calls which Frankenhauser denied took place, a representative or employee of plaintiff was with Campbell during part or all of the call. On another occasion, Campbell called Frankenhauser from West Germany at the direction of a group of plaintiff's representatives who wanted to be sure that the deletion would be acceptable. Campbell reported back to the group soon after making the call. He recounted to them statements made by Frankenhauser in response to questions the group had raised, including Frankenhauser's representations that the deletion of the engine would be acceptable. Frankenhauser denied making such a representation in this or any other call. In view of the strong evidence corroborating Campbell's testimony and the fact that Frankenhauser solicited Campbell to find a small shipyard to submit the proposal, and having viewed the witnesses' demeanor, this Court has no doubt that the events unfolded as testified to by Campbell. Despite the problems visited upon plaintiff by its reliance on Frankenhauser's representations, however, plaintiff is not entitled to relief based on the doctrine of equitable estoppel.

██ In order to estop the government, the conduct or representations relied upon by plaintiff must have been made by a government officer acting within the scope of his authority. *City of Alexandria v. United States,* 3 Cl.Ct. 667, 679 (1983) (Nettesheim, J.), *appeal filed,* No. 84–713 (Fed. Cir. Dec. 19, 1983). Here, Frankenhauser did not have authority to contract for the government. Furthermore, the RFP gave

the name and telephone number of Lcdr. James Neas as the person to contact for information regarding the RFP. Additionally, the RFP provided:

3. EXPLANATION TO OFFERORS. Any explanation desired by an offeror regarding the meaning or interpretation of the solicitation, drawings, specifications, etc., must be requested in writing and with sufficient time allowed for a reply to reach offerors before the submission of their offers. *Oral explanations or instructions given before the award of the contract will not be binding* [emphasis added].

Moreover, the information given plaintiff by Frankenhauser was not authorized by 41 C.F.R. 12–3.5008–2(b). That section provides that "... necessary technical or other information ... may be transmitted to prospective contractors by other personnel via contracting personnel, *at meetings arranged by contracting personnel, or by official correspondence from the contracting officer...* [emphasis added]." Thus even assuming Frankenhauser was one of the "contracting personnel," this section in no way authorized him to make telephonic representations to plaintiff.

Frankenhauser was not authorized to make oral representations to plaintiff regarding either the RFP or the COR. Plaintiff's reliance on these representations directly contravened the plain language of the RFP. Moreover, plaintiff did not follow the requirements of the RFP to obtain clarifying technical information. Plaintiff, therefore, cannot estop the defendant from asserting that the plaintiff violated COR section 042b.

### 3. *Ambiguous COR Requirements*

■ Plaintiff contends that COR sections 042b and 200a are ambiguous because the terms "propulsion plant," "propulsion configuration," and "substitution" are not defined. Plaintiff, asserting the doctrine of *contra proferentem*, argues that the ambiguity should be resolved against the defendant, the party who drafted the clause. *Stoner-Caroga Corp., Inc. v.*

*United States*, 3 Cl.Ct. 92, 95 (1983) (Miller, J.). Plaintiff further contends that its interpretation of the ambiguity is reasonable and, therefore, should be given effect. *See AABCO, Inc. v. United States*, 3 Cl.Ct. 109 (1983) (Yock, J.). This Court disagrees.

First, unlike the situation in *AABCO*, plaintiff alleges a patent ambiguity on the face of the RFP. Plaintiff knew from the outset that the deletion of an engine, shaft, strut and propeller would do violence to COR section 042b. A number of plaintiff's witnesses, including its president, testified accordingly. Yet plaintiff did not follow the procedures in the RFP to obtain clarifying information. *See Great Western Steel v. United States*, 3 Cl.Ct. 510, 516 (1983) (Colaianni, J.); *Anthony Grace and Sons, Inc. v. United States*, 193 Ct.Cl. 248, 253–55, 433 F.2d 766, 768–69 (1970). Instead, plaintiff relied on the unauthorized representations of Captain Frankenhauser. Plaintiff having "bridged the crevasse" without consulting the appropriate government representative in the manner called for in the RFP, did so at its own risk. *J.A. Jones Construction Co. v. United States*, 184 Ct.Cl. 1, 13, 395 F.2d 783, 790 (1968).

Second, the Court finds that COR sections 042b and 200a are not ambiguous. Section 042b sets forth the requirements that the Parent Craft must meet to be an acceptable Parent Craft. It further limits the deviations allowed between the Parent Craft and the WPB. In particular, it provides that "[t]he Parent Craft shall possess the same hull form and dimensions ... principal hull structure, underwater appendages, and propulsion configuration as the WPB." These items relate specifically to the hydrodynamics of the craft. By ensuring that the WPB had the same hull from and dimensions, principal hull structure, underwater appendages, and propulsion configuration as the Parent Craft, the Coast Guard could rely on the hydrodynamics of the Parent Craft in predicting the performance of the WPB.

Section 200a is directed to the propulsion plant of the craft. The section states:

PROPULSION PLANT

**200a.** *General*

The propulsion plant and supporting components shall be identical to the Parent Craft specified in section *042.*

.... Main propulsion engines, reduction gears, shafting, bearings and propellers shall be identical to the parent craft. If equipment substitutions are necessary the provisions of section 042 shall apply. *Propulsion plant substitutions meeting the criteria in section 042 will be approved* subject to performance verification in full scale trials [emphasis added].

A working definition of propulsion plant is contained in section 200a as "[m]ain propulsion engines, reduction gears, shafting, bearings and propellers...." Section 200a allows substitutions in the propulsion plant provided that the criteria in section 042 are met. For example, at least one offeror was allowed to substitute a smaller engine for a larger engine because the change did not substantially affect section 042b items. Plaintiff's attempt to delete an engine, shaft, strut and propeller on the other hand, substantially altered the underwater appendages and propulsion configuration of its Parent Craft and therefore was not allowed.

The Court finds untenable plaintiff's contention that the deletion of an engine, shaft, strut and propeller is a substitution of a two propulsion plant design for a three propulsion plant design, and was therefore an allowable substitution under section 200a. Section 200a substitutions were to be allowed provided the criteria in section 042 were met. No matter how creatively plaintiff labels the change, the plain fact remains that the deletion of an engine and its attendant underwater appendages violated section 042b.

**4.** *Procedures*

▇ Finally, plaintiff contends that the defendant failed to follow the procedures set forth in the RFP and amplified in DOT Order 4200.11A. The plaintiff contends specifically that because a two engine variant of a three engine Parent Craft was unacceptable, the Coast Guard should have eliminated plaintiff's proposal at the outset rather than five months into the competition. The plaintiff misunderstands the procedures which the Coast Guard was required to follow.

COR section 042b was a Pass/Fail item. Failure to meet it was disqualifying. A deficiency is defined in DOT Order 4200.-11A as "a descriptive statement(s), or lack thereof, that fails to meet or does not allow the evaluators to determine if the minimum requirements of the RFP are met." Thus, failure to meet COR section 042b constituted a deficiency. The Coast Guard informed plaintiff of this deficiency at the same time it informed all other offerors of their deficiencies. In doing so, the Coast Guard acted according to the RFP and DOT Order 4200.11A.

Plaintiff's proposal was not so grossly deficient as to be totally unacceptable on its face, within the meaning of the RFP, so that it should have been eliminated in the preliminary review stage. As its name indicates, in this stage the Coast Guard undertakes only a preliminary review of all the proposals and tends to give proposals the benefit of the doubt. The fact that a proposal is not eliminated at this stage says little about its merits. Of the two proposals eliminated, one consisted of nothing more than a propeller. The Coast Guard was justified in not finding plaintiff's proposal of over 250 pages grossly deficient. Furthermore, there was testimony that the Coast Guard believed a two shaft variant of the SAR–33 existed.

Similarly, the deletion of an engine, shaft, strut, and propeller was not an ambiguity as defined in DOT Order 4200.11A. Moreover, the Order provides that deficiencies are not to be discussed in this stage. The Coast Guard acted according to procedure when it did not notify plaintiff of the section 042b deficiency during the ambiguity stage.

Plaintiff makes much of the fact that when the Coast Guard notified plaintiff of the 042b deficiency, it also notified plaintiff of other rectifiable deficiencies and weaknesses. Plaintiff then expended considera-

**42**

ble funds to rectify these items. The proposals, however, were evaluated by three teams, each with a responsibility for evaluating different areas of the proposal. All of the deficiencies and weaknesses compiled by the teams were submitted to the offerors. Only in this way could the Coast Guard conduct a fair and orderly evaluation of the proposals.

Finally, plaintiff challenges the Coast Guard's actions in issuing RFP Amendment No. 6, which changed one paragraph of COR section 042b from a Pass/Fail item to a Major Item Related to COR Requirements. That paragraph provided that "[t]he Parent Craft shall have demonstrated the speed and seakeeping specified in Section 070b for the displacement and LCG shown in the Contract Design Weight Estimate for the WPB."

Commander Tozzi testified that it was a practical impossibility for any offeror to meet the requirements of this paragraph. He further testified that when Amendment No. 6 was first issued, plaintiff complained that its proposal had met these requirements. The Engineering Evaluation Team then reworked its calculations and again determined that plaintiff's proposal failed to meet the displacement and LCG requirements. Plaintiff has offered no evidence from which this Court could determine that the Coast Guard's determination and redetermination that plaintiff failed to meet the requirements of this paragraph of section 042b lacked a rational basis, or that plaintiff was treated disparately.

### CONCLUSION

Based on the foregoing considerations, plaintiff has not shown that the Coast Guard failed to fairly and honestly consider its proposal. The Clerk will enter judgment in favor of defendant and dismiss the complaint.