**BOLLINGER MACHINE SHOP & SHIPYARD, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 84–1763.**

United States District Court, District of Columbia.

July 13, 1984.

Marcus B. Slater, Jr., Michael Joseph, Donald M. Squires, Kominers, Fort, Schlefer & Boyer, Washington, D.C., for plaintiff.

John Bayly, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM

FLANNERY, District Judge.

Plaintiff in this case was an unsuccessful bidder in a United States Coast Guard procurement in which the Coast Guard sought sixteen Patrol Boats ("WPB's") on an expedited basis to combat drug smuggling in the Gulf Coast area. The contract award was given to Marine Power & Equipment

Company ("MPE"), and plaintiff here complains that the successful bid was not responsive. Plaintiff requests the court to order that the Coast Guard terminate its contract with MPE and award it to plaintiff. Based on the facts adduced at a trial on the merits, and for the reasons stated herein, the court will grant plaintiff's request to set aside the Coast Guard's award to MPE, but will deny plaintiff's request for an order awarding plaintiff the contract. Instead, the case will be remanded to the Coast Guard for appropriate action not inconsistent with this opinion.

BACKGROUND

On May 11, 1984, the Coast Guard awarded MPE the contract at issue in this case. Plaintiff soon discovered certain information which led it to believe that the award was improper because MPE's proposal could not have met the WPB specifications established by the Circular of Requirements ("COR") governing this procurement. On June 8, 1984, plaintiff filed the instant complaint, and simultaneously moved for a temporary restraining order and/or a preliminary injunction to stop performance of the Coast Guard/MPE contract. The court set the matter down for a hearing on the TRO, and notified counsel for plaintiff, the Coast Guard, and MPE, a potential intervenor.[1] After the hearing, the court denied plaintiff's motion for a TRO after balancing the equities. After consultation with counsel, however, the court determined that the dispute should be decided expeditiously on the merits. Without objection, an expedited discovery schedule was established, and the case was set down for a trial on the merits on July 9, 1984. The parties were able to work out discovery disputes with minimal interven-

tion by the court, and depositions were taken of the witnesses who would appear at trial. Defendant submitted certain information to the court *in camera* which contained apparently proprietary information that defendant considered necessary for the court's review of the agency's action. On July 9, 1984, the case was tried by the court sitting without a jury. The court, having considered the pleadings filed in this case, the testimony of the witnesses, the documents in evidence and the stipulations of the parties, the defendant's *in camera* submissions,[2] and the arguments of counsel, hereby makes the following findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

FINDINGS OF FACT

A. *General Description of WPB Procurement*

1. In late 1982, the Coast Guard determined that there was an urgent need for patrol boats to be used for alien and drug interdiction on the gulf and southeast coasts of the United States. In order to ensure that it could expeditiously obtain reliable and proven crafts that could meet the requirements necessary for this urgent mission, the Coast Guard developed the "Parent Craft" concept, and explicitly incorporated that concept into its Request for Proposals (RFP) and Circular of Requirements (COR) for RFP DTCG23–83–R–30024.

2. The Parent Craft concept utilized for this WPB procurement represented a departure from normal procurement procedures. As Commander Tozzi, a member of the Source Evaluation Board and Engineering Evaluation Team for this procurement

---

**1.** MPE has been on notice of this case from the outset, but has not moved to intervene. An MPE officer filed an affidavit in this case in opposition to plaintiff's motion for preliminary injunctive relief, and, according to counsel for the Coast Guard, MPE has been fully advised of these proceedings and has worked informally with the Coast Guard. Having failed to move to intervene, for whatever strategic or practical reasons, MPE has chosen to have its interests in this litigation spoken for by the Coast Guard.

**2.** The court notes that these documents will be filed under seal to be made part of the record. In addition, the court notes that it was unnecessary to rely on these documents for its decision, although they provided useful background information that reinforced evidence that is in the record and available to both parties. Finally, because defendant submitted these documents, it is in no position to object to the court's incidental reliance on them.

testified, a normal procurement involves thorough and time consuming design development, engineering studies, and testing to work out design difficulties that can be expected with a new craft. For the WPB procurement at issue, the Coast Guard determined that use of the "Parent Craft" concept would result in much faster procurement and construction of a tested, reliable boat which greatly reduced risk to the Coast Guard. The "Parent Craft" concept was very simple—each offeror was required to designate a "Parent Craft" from among existing, fully proven patrol boats, and the "daughter craft" proposed to be constructed would be required to be identical or similar to the Parent Craft in critical areas set forth in the COR. By making use of this concept, the Coast Guard believed it could avoid the need for the normally required extensive engineering studies and testing, and could obtain proven WPB's quickly and with minimal risk that they would fail to perform as required. In a Coast Guard announcement in the March, 1983, *Commerce Business Daily*, it was emphasized that the proven Parent Craft concept was being utilized "to minimize Coast Guard technical risk."

3. The requirements for the Parent Craft and the WPB (the "daughter craft" to be constructed) were set out in some detail in the COR for this procurement. In July, 1983, approximately eleven proposals were received. Throughout the procurement process, the "Parent Craft" concept was stressed, and when bidders requested clarification on critical issues such as Parent Craft/WPB similarity requirements, the Coast Guard routinely replied that the COR was clear, and referred bidders to specific provisions in the COR without comment. Through a gradual process of eliminating bidders who could not correct disqualifying deficiencies, the field was narrowed to two—MPE and plaintiff Bollinger Machine Shop. A third bidder, Eastern Marine, Inc., challenged the Coast Guard's decision to eliminate it for proposing a WPB that was "dissimilar" from its Parent Craft, but the Coast Guard's decision was upheld by the United States Court of Claims in *Eastern Marine, Inc. v. United States*, 5 Cl.Ct. 34 (1984). In that action, plaintiff Bollinger intervened along with MPE to defend the Coast Guard's decision to eliminate Eastern Marine from the competition.

4. Plaintiff submitted its "best and final offer," and MPE submitted at least two "best and final offers," one with WPB's containing 12-cylinder engines and another with 16-cylinder engines. On May 11, 1984, the Coast Guard awarded the contract to MPE for production of up to 16 WPB's with 12-cylinder engines, for an approximate price of $76 million. Shortly thereafter, plaintiff initiated this lawsuit, alleging that the Coast Guard's selection of MPE's 12-cylinder craft was not permissible under the COR, primarily because the MPE Parent Craft was believed to contain a 20-cylinder engine, making substitution of the 12-cylinder engine "dissimilar" and inconsistent with the Parent Craft concept.

B. *Specific Requirements of the COR*

5. The Coast Guard's requirements for each competitor's Parent Craft and WPB's were set forth in the COR. Section 042b, *"Parent Craft"*, states that the "Parent Craft shall have been previously designed, built, and operated as a patrol craft." Among other requirements, § 042b states that

The Parent Craft shall meet the requirements of COR 100b (Structure), 200a (Propulsion Plant), and 200b (Propulsion Plant Rating).

The Parent Craft shall have demonstrated the speed and seakeeping specified in Section 070b ....

6. The "Propulsion Plant" requirements that the Parent Craft was required to satisfy are contained in § 200a. These critical requirements also had to be met by the "daughter" WPB. The requirements of § 200a were deemed "pass-fail" requirements by the Coast Guard. Section 200a, entitled "Propulsion Plant, General," reads as follows:

200a. *General*

The propulsion plant and supporting components shall be identical to the Parent Craft specified in section 042.

The propulsion engines shall be diesel marine engines with reverse reduction gears. Delta configured engines are not acceptable. Main propulsion engines, reduction gears, shafting, bearings and propellers shall be identical to the parent craft. If equipment substitutions are *necessary* the provisions of section 042 shall apply. Propulsion plant substitutions meeting the criteria in section 042 will be approved subject to performance verification in full scale trials. [emphasis added].

7. As is evident from even a quick reading of § 200a, the COR required that the WPB "engines, reduction gears, shafting, bearings, and propellers shall be identical to the parent craft," but that "necessary" substitutions in these critical areas would be acceptable if they could meet the criteria established in § 042. COR § 042 provides the following in pertinent part:

Where equipment is specified by Manufacturer's name, make, and model number, the Contractor may propose equivalents to these equipment. In order for the proposed item to be acceptable, it must be approved by the Government based on the following:

1. Possess appropriate regulatory body approval where required.

2. Possess similar:

a. dimensions

b. weight

[c. omitted]

d. performance

e. service

f. material

g. maintenance features

h. time in service

i. population in marine use

j. vendor furnished training

k. vendor furnished service

l. data

m. warranty

n. supportability

When lesser dimensions and weights *and superior power, service, material, and maintenance characteristics are demonstrable* and are to the advantage of the WPB's mission, the proposed item will be acceptable provided all other criteria are met. [emphasis added].

8. The Parent Craft and WPB speed and power requirements are contained in § 200b, which in turn refers to § 070b. Section 200b, entitled "Propulsion Plant Rating," reads as follows:

200b. *Propulsion Plant Rating*

The propulsion engines shall be rated to meet the speeds required by section 070b. The requirements for the trials are contained in section 094. The maximum speed requirement shall be attainable while operating at or below the "Intermittent or Crew Boat Rating" as used by Detroit Diesel-Allison Division, the "Light Duty Commercial Rating" as used by Cummins Engine Company and Caterpillar Tractor Company, or equivalent 8 hours continuous operation within 24 operating hours rating as published and warranted by the engine manufacturer. The maximum continuous speed requirement shall be attainable while operating at or below the continuous power rating as published and warranted by the engine manufacturer.

Section 070b, referred to in § 200b, is a subpart of Section 070, which is entitled "General Requirements for Design and Construction." Section 070b reads, in pertinent part, as follows:

070b. *Characteristics*

The operating characteristics of the WPB shall be as follows:

... SPEED: Maximum speed equal to or greater than 28 kts in Sea State 2 with at least 25 kts maximum continuous speed in Sea State 2. Best economical speed of at least 10 kts on two shafts.

NOTE: The maximum speed and the maximum continuous speeds shall be attainable at half load displacement. The calm water trial speeds required to

demonstrate this speed are specified in section 094.

... ENDURANCE: Minimum five days of fuel, water, and provisions. Fuel endurance to provide 96 hours at best economical speed on two shafts plus 24 hours at maximum continuous speed with at least 10% usable fuel reserve remaining.

9. Section 70e, entitled "Design Conditions," reads in part as follows:

070e. *Design Conditions*

Equipment and machinery shall be capable of operation with sea water temperatures ranging from a high 85°F to a low of 28°F.

Equipment and machinery shall be capable of operation with exterior air temperature from minus 40°F to 105°F with relative humidity ranging from zero to one hundred percent.

10. Both Sections 70b, which sets forth speed requirements, and section 200b, which refers to engine speed requirements, refer to Section 094. Section 094c, entitled "Preliminary Acceptance Trials," reads, in pertinent part, as follows:

During the Preliminary Acceptance Trials the WPB shall demonstrate the ability to attain the speeds required in section 070 by calm water performance as follows:

1. A speed of 26 knots shall be demonstrated at an engine power no greater than the continuous power rating specified in section 200b.

2. A speed of 29.5 knots shall be demonstrated at an engine power no greater than the 8 hour rating specified in section 200b.

C. *Bollinger WPB Proposal*

11. Throughout the procurement process, plaintiff Bollinger took a conservative approach in an attempt to adhere closely to the "Parent Craft" concept, with particular care in attempting to meet the commonality requirements with regard to its WPB engine and propulsion configuration. Its parent craft contained a 16-cylinder Paxman Valenta engine built in 1974. Between 1974 and 1983, the engine manufacturer made internal design changes to upgrade the horsepower in its engine from 2583 BHP to 3350 BHP. The older engine is no longer available. In order to avoid the propulsion configuration changes that would be necessary to accommodate the new, more powerful 16-cylinder Paxman available for its WPB, Bollinger chose to place a governor in the new engine so that its power could be reduced to duplicate what was producted by the old engine. The newer WPB 16-cylinder engine (similar in size and weight to the old engine), even as modified, makes the WPB capable of meeting all of the COR's speed and endurance requirements, both at standard ("ISO") temperature conditions and at the design conditions in § 070e.

12. During the procurement process, plaintiff Bollinger contemplated substituting the 16-cylinder Paxman engine of its Parent Craft and WPB with a 12-cylinder engine possessing required horsepower. This would have saved approximately $250,000 per boat. Plaintiff determined, however, that such a substitution was not permitted by Section 042a of the COR because the 12-cylinder engine would not have been "similar" to the 16-cylinder engine in the Parent Craft. Bollinger's 16-cylinder WPB final offer cost more than MPE's 12-cylinder proposal.

13. The parties have stipulated that Bollinger's best and final offer "was an acceptable technical proposal from a responsible source, within the competitive range for this solicitation, conformed fully to the essential requirements of the solicitation, and was eligible for award of the subject contract." The court adopts this as a finding of fact.

D. *The MPE WPB Proposal Selected by the Coast Guard*

14. MPE's 12-cylinder engine WPB proposal was accepted by the Coast Guard over MPE's counter-proposal and Bollinger's proposal. The 12-cylinder engine was smaller in size and weight than the engine

in MPE's Parent Craft, and changes in the propulsion configuration, described below, were necessitated by this change. The propriety of the Coast Guard's acceptance of this engine substitution and the changes thereby necessitated is the key issue in this lawsuit.

15. The parties have entered into a stipulation regarding the size and characteristics of engines in MPE's Parent Craft and WPB. This stipulation establishes that the WPB Parent Craft engine contained either 16 or 20 cylinders, but the stipulation permits the court to adopt the finding that the Parent Craft contained a 20-cylinder engine unless defendant affirmatively establishes otherwise. The court finds that defendant has not so established, and notes that the court's decision, although not dependent upon a finding that the Parent Craft contained a 20-cylinder engine, is strengthened by such a finding. For this and other reasons, the court will adopt as fact, for purposes of this decision only, that the MPE Parent Craft contained a 20-cylinder MTU engine. As per the stipulation, the court further finds that this engine is currently available and has the following characteristics:

| | |
|---|---|
| Main Engine (Number) | MTU20V538TB92 |
| Number of Cylinders | 20 |
| Overload (2 hours in 12) | 4705 BHP |
| Continuous Operating Rating Per Engine | 4265 BHP |
| Length, Basic Engine | 150.8 inches |
| Engine and Gear | 205.9 inches |
| Weight, Basic Engine | 19,000 lbs. |

16. This 20-cylinder engine in MPE's Parent Craft possessed sufficient power to enable the craft to attain speeds, at test conditions, of above 38 kts., well above the speed requirements for the Parent Craft and the WPB. If this engine were utilized in the WPB, its maximum power would not need to be tapped, and its maintenance costs and overhaul frequency would be relatively low. Major overhaul of this engine would be necessary approximately every

6000 hours. However, a WPB equipped with this engine could not have met the endurance and cruising range requirements set forth in § 070b, as Commander Tozzi testified.

17. The parties have also stipulated, and the court adopts as fact, that the engines in MPE's WPB as accepted are 12-cylinder engines manufactured by MTU, and have the following characteristics:

| | |
|---|---|
| Main Engine (Number) | MTU12V538TB92 |
| Number of Cylinders | 12 |
| Overload (2 hours in 12) | 2830 BHP |
| Continuous Operating Rating Per Engine | 2555 BHP |
| Length, Basic Engine | 108.1 inches |
| Engine and Gear | 153.70 inches |
| Weight, Basic Engine | 11,330 lbs. |

18. The MPE 12-cylinder engines were rated by their manufacturer in an unsigned letter as having a maximum metric horsepower of 2710 BHP for 8 in 24 hours at "ISO" conditions of 80° air and water temperature. Under these ISO conditions, the engines could propel the WPB at a maximum operating speed of 29.7 kts, just above the 29.5 kts. maximum speed required by § 094c. The engine therefore provides an extremely low "power margin," if any. The 2710 BHP rating for the 12-cylinder engine is considerably lower than the 4265 BHP continuous operating rating of the 20-cylinder Parent Craft engine.[3] The 12-cylinder MPE WPB engine has considerably less horsepower than the 20-cylinder MPE Parent Craft engine. Further, as admitted by the Coast Guard, the 12-cylinder MPE engine presents "risk that the power required for 29.5 kts [see § 094c] will not be available at the upper temperature limits of the WPB design conditions." [see § 070e].

19. The MPE 12-cylinder engine will require substantially more maintenance than the 20-cylinder engine would have required, in part because the smaller engine will have to strain at times to achieve desired speeds. As demonstrated by letters from

---

**3.** The 12-cylinder rating is also considerably lower than the 16-cylinder engine that might have been in the MPE Parent Craft, according to the stipulation, Plaintiff's Exhibit 9. The 16-cylinder MPU engine has a continuous operating rating of 3410 BHP.

the MTU engine manufacturer, the 12-cylinder engine will require a major overhaul every 3000–3500 hours if operated at the design conditions specified in § 070e of the COR, *see* Plaintiff's Exhibits 5 & 6. The Coast Guard was aware of the maintenance problems associated with the MPE 12-cylinder engine when it selected MPE's WPB.

20. The change in engine size and power from MPE's Parent Craft to its WPB necessistated some changes in the craft's propeller, underwater appendages, and "trim tabs," which regulate how the craft sits in the water.

21. After listening to the testimony of Commander Tozzi of the Coast Guard and Commander Gale (plaintiff's expert), and after reviewing the Coast Guard's engineering reports submitted both *in camera* and as Exhibits, the court is of the view that the smaller engine size and changes in underwater apparatus in MPE's WPB present a risk that the MPE WPB will not immediately perform as required, which may cause delay before the boats are tested and operational. This risk arises because changes have been made from the tested MPE Parent Craft, and the WPB has a low margin of power.

22. In the Coast Guard's view, MPE's engine substitution was "necessary" because the MPE Parent Craft could not meet the COR's endurance and habitability space requirements with the larger engine. The Coast Guard interpreted § 042a of the COR as permitting the engine substitution because, in its view, the risks thereby presented were not substantial and such a substitution would be to the advantage of the WPB's mission. Primarily because the MPE proposal, which contained the smaller 12-cylinder engine, was less costly than plaintiff Bollinger's 16-cylinder engine proposal, the Coast Guard accepted the MPE bid.

## CONCLUSIONS OF LAW

### A. *Procedural Issues*

■ This court has jurisdiction to award equitable relief to plaintiff, a disap-

pointed bidder following the award of a contested contract, *B.K. Instrument, Inc. v. United States,* 715 F.2d 713, 723 (2d Cir.1983) (Friendly, J.). Further, as one of two remaining bidders, and having suffered economic injury as the result of the Coast Guard's award of the WPB contract to MPE, plaintiff has standing to challenge the award in this court, *Scanwell Laboratories, Inc. v. Schaffer,* 424 F.2d 859 (D.C. Cir.1970).[4]

■ Defendant has argued strenuously that plaintiff is barred by the doctrines of *res judicata* and collateral estoppel from asserting its claim in this court, because the Court of Claims adjudicated the Coast Guard's rejection of a third bidder in *Eastern Marine, Inc. v. United States,* 5 Cl.Ct. 34 (1984), an action in which both plaintiff and MPE intervened on the side of the Coast Guard. The court disagrees. Under the doctrine of *res judicata,* a final judgment on the merits bars further claims by the same parties *based on the same cause of action. Montanta v. U.S.,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). Although plaintiff was a party in *Eastern Marine,* that litigation involved parties and alignments not present here, and did not involve the same cause of action as is involved in the present case. *Eastern Marine* involved the propriety of the Coast Guard's exclusion of Eastern Marine from further consideration in the WPB procurement, whereas this action involves the propriety of the Coast Guard's award of the contract to *MPE.* Under the doctrine of collateral estoppel, a party may not contest in a subsequent proceeding any issue of fact *actually litigated* in and determined by a previous final judgment, and the prior judgment is not conclusive as to any matter not essential to judgment in the prior adjudication, *Stebbins v. Keystone Insurance Co.,* 481 F.2d 501, 506 (D.C.Cir. 1973). The *Eastern Marine* court was not

---

**4.** *Scanwell Labs.* also establishes that plaintiff was not required to seek review of the MPE award from the General Accounting Office be-

fore coming to this court, although plaintiff had that option, *Scanwell Labs.,* 424 F.2d at 875.

called upon to determine the validity of the Coast Guard's decision to retain MPE as a bidder—it was called upon to determine whether Eastern Marine was properly excluded. Although the Court of Claims made passing reference to the "similarity" of MPE's WPB and Parent Crafts as compared to the similarity of Eastern Marine's crafts, those comments were mere dicta. That court could have decided the issue before it without any reference to MPE. Further, the *Eastern Marine* court was not presented with the facts and arguments, presented here, regarding the propriety of MPE's engine substitution. Finally, plaintiff had no reason to challenge the Coast Guard's retention of MPE in the pre-procurement stage—plaintiff was on the *same side* of the *Eastern Marine* case as both the Coast Guard and MPE, and had not yet been denied the contract award in favor of MPE. Plaintiff did not litigate the propriety of the Coast Guard's actions *vis a vis* MPE in *Eastern Marine;* therefore the doctrine of collateral estoppel does not bar this litigation.

## B. *Standard of Review*

 Although plaintiff is thus free to challenge the MPE award in this court, it faces a heavy burden of demonstrating either that "(1) the procurement official's decision on matters committed primarily to his own discretion had no rational basis or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations." *Kentron Hawaii, Limited v. Warner*, 480 F.2d 1166, 1169 (D.C.Cir.1973). As the second branch of this test implies, however, the Coast Guard is not free to ignore its own regulations regarding the responsiveness of bids, *see Scanwell Labs.*, 424 F.2d at 873. In this case, the procurement was governed by a detailed set of requirements set forth in the COR, and the overriding emphasis of the procurement was that WPB designs, especially with regard to the craft's propulsion plant, had to be "identical to," or in limited cases, "similar to" the Parent Craft. The Coast Guard intentionally imposed limitations on its own discretion in this case, and by labelling WPB propulsion plant requirements as "pass-fail", represented to bidders that deviations from specifications in this area would not be permissible unless explicitly permitted by the COR. The Coast Guard was bound to the "Parent Craft" concept, and could not exercise discretion in certain areas consistent with the requirements of the COR, *see S. Livingston & Son, Inc.*, B–183820, Sept. 24, 1975, 75–2 CPD 179 (Comptroller General decision).

## C. *Propriety of Coast Guard Award to MPE under Requirements of the COR*

The crux of plaintiff's case is that the Coast Guard violated the requirements of the COR and ignored its "Parent Craft" concept in awarding the WPB contract to a bidder that substituted a 12-cylinder engine for a 20-cylinder Parent Craft engine.[5] Plaintiff contends that MPE's bid was nonresponsive due primarily to this substitution. It argues that MPE, unlike plaintiff Bollinger, elected to read the COR in an impermissibly expansive manner by substituting the 12-cylinder engine, and that the Coast Guard, overly concerned with cost, fell prey to the temptation of ignoring its own requirements by accepting the MPE bid. There are four basic legs to plaintiff's argument: First, that § 200a, consistent with the Parent Craft concept, required that WPB engines be "identical" to Parent

---

**5.** As noted in Finding ## 14–15 above, MPE's substitution might have involved a 16 for 12-cylinder switch. Because the 12-cylinder engine is smaller than the 16-cylinder engine and may not possess "demonstrably superior power and maintenance," this substitution was probably a violation of § 042 as well. But little evidence on the maintenance characteristics of the 16-cylinder MTU engine was presented, as the parties, consistent with the stipulation permitting the assumption that the MPE Parent Craft engine was a 20-cylinder engine, presented their comparative evidence with the 20-cylinder engine in mind. As noted in Finding # 15, the court will treat the MPE Parent Craft as having contained a 20-cylinder engine, consistent with the stipulation.

Craft engines, unless a substitution was "necessary." Plaintiff argues that this provision must be read strictly, and that a substitution cannot be deemed "necessary" unless the Parent Craft engine is no longer available. MPE's Parent Craft engine is still available, so plaintiff concludes that the substitution was barred by § 200a. Plaintiff further argues that the MPE/Coast Guard interpretation of "necessary" as "necessary to bring the WPB in compliance with COR specifications" is a non-sensical reading that defeats the whole purpose of the Parent Craft concept. Second, plaintiff argues that even if MPE's engine substitution was somehow "necessary," the 12-cylinder WPB engine was not "similar" to the 20-cylinder Parent Craft engine as required for substitutions under § 200a and § 042. Plaintiff argues that the explicit requirements of similarity in weight, length, etc. set forth in § 042 are not satisfied by the MPE substitution. Plaintiff's third argument, which is a critical subpart of its "similarity" argument, is that in evaluating the "similarity" of the MPE engine substitution, the Coast Guard ignored the explicit requirement of § 042 that smaller engines could not be substituted unless "superior power ... and maintenance are demonstrable." Finally, plaintiff argues that MPE's proposal cannot meet the speed requirements of § 070a and § 094c, because the 12-cylinder engine,

properly rated according to § 200b, cannot meet the 29.5 knot requirement under the design conditions set forth in § 070e.[6] Therefore, concludes plaintiff, MPE's proposal is unresponsive.

The court, mindful of the duty to defer to administrative judgment in technical areas committed to its discretion, must reject several of plaintiff's contentions despite the court's agreement with their merit. In addition, the court has strained to give the benefit of every close call regarding COR interpretation to the Coast Guard,[7] despite the court's overriding conclusion that the Coast Guard misled Bollinger with several COR specifications and weakened its own commitment to the Parent Craft concept beyond permissible limits. Nevertheless, the court holds that by simply ignoring the explicit requirement of § 042 that smaller engine substitutions must possess certain salient characteristics *before* the discretionary "similarity" test was to be applied, the Coast Guard violated its own regulations and awarded the WPB contract to a non-responsive bidder.

1. *Section 200a and "necessary" substitutions*

■ Section 200a of the WPB COR requires that WPB engines be "identical" to the Parent Craft engines. Immediately thereafter, however, it permits substitu-

---

6. Plaintiff argues that the only sensible way to read the COR is that the trial speeds required in § 094c must be met at the design conditions set forth in § 070e. Defendant admits that at the higher temperatures (85° water, 105° air) established by the design conditions, the MPE 12-cylinder engine must be "de-rated" to 93% of its 2710 BHP rating, and that the lower horsepower would not enable the engine to go the required 29.5 kts. at these temperatures. Defendants contend that under the COR, the § 094 speed trials are to be conducted at "ISO" conditions of 80° air and water temperature, and that the 12-cylinder engine can reach required speeds at that temperature. Although the court agrees with plaintiff that, logically, required speeds should be reachable at the extreme design conditions specified, especially since that is standard practice for engine testing, the court does not believe defendant's reading of the COR is patently unreasonable. Section 200b of the COR specifies that the § 094 maximum speed

requirement shall be attainable while operating at or below an 8 in 24 continuous operating rating "as published and warranted by the engine manufacturer." While MTU, in an unsigned letter, did not unequivocally warrant the MPE 12-cylinder engine at 2710 BHP, it did state that such power could be achieved at "ISO" conditions. That rating would enable the WPB to meet required speeds. This warranting arguably complies with the requirements of § 200b, and the court is hesitant to find MPE's offer non-responsive for failure to meet the speed requirements because this is a very technical area properly committed to Coast Guard discretion. Therefore, although much evidence was adduced on this point, it need not be further discussed.

7. *See supra* note 6, and discussion *infra* of the Coast Guard's interpretation of "necessary" and "similar."

tions that are "necessary" provided that they meet the similarity requirements of § 042. As defendant concedes, the "necessity" requirement must be satisfied before the "similarity" evaluation is undertaken. Although plaintiff asserts that the "plain english" meaning of "necessary" is that substitutions are not permitted unless the parent craft engine is no longer available, both plaintiff and defendant urge the court to interpret the term in light of the overall spirit of the COR. Plaintiff stresses that an interpretation of "necessary" that would allow substitutions in order to enable the WPB to comply with COR specifications in areas where the Parent Craft fails would eliminate the entire purpose of the Parent Craft concept. This argument has considerable appeal, but the court, here giving special deference to the Coast Guard's reading of the COR, rejects plaintiff's argument. As the Coast Guard points out, the Parent Craft was intended to be a model, not the final product. If the Coast Guard had wanted to obtain WPB's that were identical to existing Parent Crafts, it could have simply addressed the procurement to Parent Craft manufacturers and selected from among the dozens of currently available Patrol Boats previously manufactured. Instead, the Coast Guard wanted WPB's more specifically tailored to a specific mission, but wanted them quickly. Hence it adopted the "Parent Craft" concept to speed production and reduce risk, but wrote into the COR several discretionary clauses so that the WPB could be more specifically tailored. Section 042b, which establishes the requirements for Parent Crafts, does *not* require that craft to meet all the specifications that will be required for the WPB. With regard to engine related requirements, the Parent Craft must meet the general design requirements of § 200a and § 200b, and must meet the *speed* requirements of § 070b. Although MPE's Parent Craft, with the powerful 20-cylinder engine, could not meet the *endur-*

*ance* requirements of § 070b, it could easily meet the *speed* requirements, and that made it an acceptable model. Defendant reads the § 200a necessity requirement as permitting changes in *acceptable* Parent Crafts to bring them into conformance with *WPB* specifications in areas, such as endurance, that need not be satisfied by the Parent Craft. Given the partial goal of the procurement of obtaining WPB's more specifically tailored to the WPB mission than the Parent Craft, this reading, although stretched, is not unreasonable.[8] Because MPE's substitution was "necessary" as read by the Coast Guard, its bid was not unresponsive under § 200a.

### 2. *Section 042 and the "similarity" requirement.*

■ MPE's 20 to 12-cylinder engine substitution clearly involved changes in engine dimension, weight, performance, service, and maintenance features. Plaintiff argues that the engines simply cannot be viewed as "similar" in these respects as required by § 042. Again, this argument has substantial appeal, given the large percentage deviations for these salient characteristics of the MPE engines. Plaintiff has pointed to several persuasive Comptroller General decisions that have held that when salient characteristics are listed as critical to an agency's evaluation of a bid, the agency cannot accept bids that fail to satisfy these characteristics *even if* it determines that the bid would still satisfy performance requirements, *see S. Livingston & Son, Inc., supra; Cummins Mid-America, Inc.,* B–185664, May 26, 1974 (Comptroller General decision). In this case, in which the COR stressed the need for conformance to the Parent Craft, especially in the propulsion plant area, *see* § 200a, the type of expansive interpretation of "similar" the Coast Guard adopted in permitting the MPE engine substitution seems unreasonable. If the similarity requirement is to have any real meaning, it should not be

---

**8.** Having said this, it is not clear to the court that the Coast Guard actually *applied* the interpretation that it now offers. The deposition of Commander Tozzi, at 130, indicates that the Coast Guard did not even *consider* the "necessity" of MPE's engine substitution, but simply proceeded to evaluate it's engineering feasibility.

read as a loophole through which seemingly large substitutions can be driven.

But the Coast Guard argues that the expansive interpretation of "similar" it adopted to allow the MPE engine substitution is supported by the clause in § 042 that immediately follows the list of salient characteristics that must be "similar" to permit a substitution. This clause, which is the basis for the court's decision in this case, reads as follows:

> When lesser dimensions and weights *and* superior power, service, material, *and* maintenance characteristics are demonstrable and are to the advantage of the WPB's mission, the proposed item will be acceptable provided all other criteria are met.

The Coast Guard argues that this clause gives the agency discretion to determine whether a substitution is "similar" based not on simple comparison, but based on whether a substitution is "to the advantage of the WPB's mission." The Coast Guard then goes on to argue that complex engineering evaluations led it to conclude that the MPE engine substitution would be to the advantage of the WPB mission. Commander Tozzi testified that although the smaller MPE engine would necessitate changes in underwater appendages and the propeller, and would create a risk that the WPB could not reach maximum required speeds in hot weather, the Coast Guard determined that the substitution was deemed permissible because it would result in more cargo space and lower cost.

Assuming, only for the moment, that the above quoted clause in § 042 vests the Coast Guard with such discretion and permits the strained reading of "similar" put forth by defendant, the court is still considerably troubled by the Coast Guard's conclusion that the 20 for 12-cylinder substitution was permissible. The Coast Guard's reading of this clause as granting it such broad discretion to permit changes in the critical WPB engine area *when that change admittedly creates design and performance risks* goes a long way toward reading the Parent Craft concept right out of the COR. Commander Tozzi testified that these risks were not judged by the Coast Guard to be substantial. Although the court is not convinced by that testimony in light of the persuasive testimony of plaintiff's technical expert (Commander Gale), it is bound to defer to the Coast Guard's judgment in this technical area. Therefore, if the court were to read the § 042 clause as does defendant, this would be a much more difficult case.

But the Coast Guard's reading of COR § 042 is patently, and almost admittedly, absurd. That section clearly and explicitly requires that a substitution involving lesser dimensions and weight, such as MPE's engine substitution, must also possess demonstrably *"superior power ... and maintenance."* The court sees no way to read these requirements other than in plain english. It is uncontradicted that the MPE 12-cylinder engine possess less power than the 20-cylinder engine in the Parent Craft.[9]

---

**9.** Commander Tozzi, while admitting that the MPE substitution engine generated less horsepower than the 20-cylinder engine and consequently was incapable of achieving speeds as great as the larger engine, asserted that to him, "superior power" does not mean "more horsepower" or "capable of producing greater speed." Instead, he asserts, it means "power that is more suitable to the WPB mission." This reading is patently unreasonable, and renders the word "superior" superfluous. Throughout the COR, the word "power" is used in connection with horsepower and speed, not in connection with endurance or other characteristics. "Superior" power can only mean "more power." It makes sense that smaller engines might be acceptable if they would generate equal or more power than large Parent Craft engines, and Command-

er Tozzi testified that internal engine changes could make this possible. The plain meaning of the term "superior power," in the context in which it is used, must be that smaller engines are acceptable only if they have more horsepower or can produce more speed than larger engines. Given the high speed requirements of the COR, the obvious risk of a smaller engine is that it will not have sufficient power to achieve required speeds, or will do so only at the cost of engine strain and more engine maintenance. To avoid these risks, consistent with the Parent Craft concept, the COR required that smaller engine substitutions would only be permitted if it was "demonstrable" that, due to superior power and maintenance, such risks would not accompany the substitution. By permitting the

It is also overwhelmingly clear that the 12-cylinder engine, which may have to run at or beyond its power limitations, will require more maintenance than would the more powerful 20-cylinder engine in the WPB Parent Craft, which would have been well within its power range at the speeds required of the WPB. In fact, the Coast Guard was aware of the maintenance risks presented by the 12-cylinder MPE proposal, but chose to ignore them. Counsel for the Coast Guard admitted that if the terms "superior power and maintenance" are read literally, then the MPE substitution would be impermissible. He urged a very strained interpretation of these terms which essentially read them out of the COR. The court cannot adopt that interpretation.

The plaintiff in this case read these terms, and the other terms of the COR heretofore discussed, to mean what they say. Such a reading was eminently justified in light of the Coast Guard's emphasis on the Parent Craft concept and on the COR as the clear and exclusive document governing this procurement. Reading these terms literally, plaintiff concluded that its contemplated substitution of a 12-cylinder engine for the 16-cylinder engine of its Parent Craft would not be permissible. It should not have been penalized for adhering to the COR, while MPE and the Coast Guard ignored the explicit requirements regarding "superior power and maintenance" contained in § 042 of the COR. Because MPE's 12-cylinder for 20-cylinder engine substitution was not responsive to the explicit requirements of § 042, this is one of the rare cases in which the court is compelled to order that an agency contract award must be set aside.

### D. *Appropriate Remedy*

█ Plaintiff requests that the court declare the Coast Guard's award to MPE to be unlawful, issue an injunction setting it aside, and order the Coast Guard to award

the contract to plaintiff, as the only remaining responsive bidder. Given the non-responsiveness of MPE's 12-cylinder engine bid, the Coast Guard's unlawful award of that bid to MPE, and the strong public interest in requiring agencies to adhere to their regulations, a balancing of the equities in this case clearly requires the issuance of an injunction setting aside the MPE award. Parallel declaratory relief is also appropriate. However, the court does not believe it may properly order the Coast Guard to accept plaintiff Bollinger's bid. Although plaintiff claims it is the only remaining responsive bidder, the record reflects that MPE submitted a second bid involving WPB's with 16-cylinder engines. Although the parties stipulated for purposes of this action that the MPE Parent Craft could be treated as if it contained 20-cylinder engines, it may have contained 16-cylinder engines. If so, MPE's alternate 16-cylinder WPB bid may be responsive. It is not clear to the court that multiple bids by the same bidder are permissible, or that MPE's 16-cylinder bid is in fact responsive, because these issues have not been litigated here. If MPE's Parent Craft contained 20-cylinder engines, then its 16-cylinder proposal will probably face the same difficulty as its 12-cylinder proposal, but even that is not clear from this record. The Coast Guard has stipulated here that plaintiff Bollinger's bid is responsive, which certainly gives the Coast Guard the option of expeditiously awarding the WPB contract to plaintiff. However, in light of the presence of another potentially responsive bid, the court will remand this case back to the agency for final selection of its WPB contractor.

An appropriate Order accompanies this Memorandum.

### JUDGMENT ORDER

This matter came before the court at a non-jury trial on the merits held on July 9, 1984. For the reasons set forth in the

---

MPE substitution, with less horsepower and higher maintenance, the Coast Guard violated

both the letter and the purpose of this clause.

accompanying Memorandum, and based on the facts found therein, after careful consideration of the pleadings and documents filed in this case, the testimony of the witnesses, the stipulations of the parties, defendant's *in camera* submissions, and the arguments of counsel, it is, by the court, this 13th day of July, 1984,

ORDERED, ADJUDGED and DE-CREED that defendant's award of Coast Guard Procurement RFP DTCG23–83–R30024 for the production of Patrol Boats (WPB's) to Marine Power & Equipment (MPE) was contrary to Coast Guard regulations in that MPE's 12-cylinder WPB offer was non-responsive; and it is further

ORDERED, ADJUDGED and DE-CREED that the above-described Coast Guard award to MPE for the production of 12-cylinder WPB's shall be set aside forthwith; and it is further

ORDERED, ADJUDGED and DE-CREED that this cause is remanded to the Coast Guard for appropriate action not inconsistent with the court's decision as discussed in an accompanying Memorandum; and it is further

ORDERED that the documents defendant submitted to the court for *in camera* review shall be filed under seal and made a part of the record in this case.